FILED

2010 NOV 23   AM IO: O4

CLERK. US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

| | |
|---|---|
| CITY OF ST. CLAIR SHORES GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, ) ) ) ) ) ) | Case No. _3:10-cv-1073-J-32JBT_ <br><br> CLASS ACTION <br><br> DEMAND FOR JURY TRIAL |
| Plaintiff, ) ) ) | |
| vs. ) ) | |
| LENDER PROCESSING SERVICES, INC., JEFFREY S. CARBIENER, LEE A. KENNEDY, and FRANCIS K. CHAN, ) ) ) ) | |
| Defendants. ) ) ) | |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act").  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

2.      Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

3.      Lender Processing Services, Inc.'s ("LPS" or the "Company") principal executive offices are located at 601 Riverside Avenue, Jacksonville, Florida 32204.

4.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## INTRODUCTION

5.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of LPS between July 29, 2009 and October 4, 2010, inclusive (the "Class Period"), against LPS and certain of its officers and/or directors for violations of the 1934 Act.  These claims are asserted against LPS and certain of its officers and/or directors who made materially false and misleading statements during the Class Period, among other things, in press releases, analyst conference calls, and filings with the SEC.

6.      At all times relevant hereto, LPS held itself out as the mortgage industry's number one provider of mortgage processing services, settlement services and default solutions,

and the nation's leading provider of integrated data, servicing and technology solutions for mortgage lenders.

7.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's business practices and financial results.  Specifically, defendants failed to disclose that the Company had been engaging in deceptive and improper document execution and preparation related to foreclosure proceedings.  The result of defendants' scheme was that the Company was able to report positive financial performance and issue positive financial guidance during the Class Period.  As a result of defendants' false statements, LPS stock traded at artificially inflated prices during the Class Period, reaching a high of $43.99 per share on October 23, 2009.

8.      In early 2010, the U.S. attorney's office in the Middle District of Florida announced investigations of LPS and its subsidiary Docx, for their improper use of false documents to foreclose on Florida homeowners.  The civil investigation focuses on allegations that LPS engaged in creating and manufacturing "bogus assignments" of mortgage ownership in order to complete foreclosures quicker.  The documents at the center of the investigations appear to be forged, as well as incorrectly and illegally executed.  Multiple investigations have since commenced, including a criminal investigation by the Florida Attorney General, the Justice Department, and several other states.

9.      In September and October 2010, multiple large banking institutions, including J.P. Morgan Chase & Co., Ally Financial Inc., the parent company of GMAC Mortgage, and Bank of America Corp., all halted foreclosures as a result of document problems amid allegations that the banking industry – through companies such as LPS – has used "robo

signers." Among other things, these "robo signers" signed documents without reviewing their contents or confirming their accuracy. A target of several investigations into grossly improper misconduct involving mortgage foreclosures, LPS has been accused of signing documents without, among other things, having them properly reviewed for accuracy.

10.     According to media reports and various investigations, the Company's default services division has also been accused of improperly splitting fees with attorneys, calling into question the source of a substantial portion of the Company's revenue. In response to the growing maelstrom of negative facts coming to light, on October 4, 2010, LPS released a statement regarding what the Company considered "mischaracterizations of its services."

11.     On this news, the price of LPS stock dropped sharply, falling $2.72 per share, or 8.6%, on October 4, 2010, to close at $28.76. The stock fell another $1.45 per share, or 5.04%, on October 5, 2010, to close at $27.31 per share, on unusually heavy trading volume.

12.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     the Company failed to disclose that it had engaged in improper and deceptive business practices;

(b)     the Company's subsidiary Docx had been falsifying documents through the use of robo signers;

(c)     the Company had engaged in improper fee sharing arrangements with foreclosure attorneys and/or law firms, including, but not limited to, undisclosed   contractual arrangements for impermissible legal fee splitting, which are camouflaged as various types of fees;

- 3 -

(d)     as a result of the Company's deceptive business practices, the Company reported misleading financial results; and

(e)     as a result of the foregoing, at all relevant times, the Company's financial outlook lacked a reasonable basis.

13.     Defendants' false statements and omissions caused LPS common stock to trade at artificially inflated prices during the Class Period. After the above revelations seeped into the market, however, the Company's shares were hammered by massive sales, sending them down approximately 37.9% from their Class Period high.

## PARTIES

14.     Plaintiff City of St. Clair Shores General Employee' Retirement System purchased LPS common stock as described in the attached certification and was damaged thereby.

15.     As set forth above, defendant LPS is a Delaware company with its principal executive offices located in Jacksonville, Florida. LPS operates in the mortgage industry and is the industry's number one provider of mortgage processing services, settlement services and default solutions, and the nation's leading provider of integrated data, servicing and technology solutions for mortgage lenders.

16.     Defendant Jeffrey S. Carbiener, ("Carbiener") is, and at all relevant times was, President and Chief Executive Officer ("CEO") of LPS.

17.     Defendant Lee A. Kennedy, ("Kennedy") is, and at all relevant times was, Chairman of the Board of LPS. During the Class Period, while LPS common stock was

artificially inflated, Kennedy sold 95,931 shares of his LPS common stock at $34.00 per share for insider trading proceeds of $3,261,654.

18.     Defendant Francis K. Chan, ("Chan") is, and at all relevant times was, Executive Vice President and Chief Financial Officer ("CFO") of LPS.

19.     Defendants Carbiener, Kennedy, and Chan (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of LPS' quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

20.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about LPS. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of LPS common stock was a success, as it: (i) deceived the investing public regarding LPS' prospects and business; (ii) artificially inflated the prices of LPS common stock; and (iii) caused Plaintiff and other members of the Class to

purchase LPS common stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired LPS common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

22.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. LPS has more than ninety-one (91) million shares of stock outstanding, owned by hundreds if not thousands of persons.

23.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

- 6 -

(e)     whether the price of LPS common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

24.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from defendants' wrongful conduct.

25.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

26.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

27.     LPS holds itself out as a leading provider of integrated technology and services to the mortgage lending industry, and has market leading positions in mortgage processing and default management services. The Company was formed in 2008 when it spun off of Fidelity National Information Services, Inc. ("FIS"). LPS services approximately 50% of all U.S. mortgages, in dollar value, using its Mortgage Servicing Packages ("MSP").

28.     The Company operates two reporting segments: (i) Technology, Data and Analytics, which produced 30% of LPS' revenue for fiscal 2009; and (ii) Loan Transaction Services, which accounted for the remaining 70%. The Loan Transaction Services segment includes default management services, which are used by mortgage lenders, servicers, attorneys, and trustees to reduce expenses associated with defaulted loans. The Company's loan

facilitation services supports most aspects of the closing of mortgage loan transactions to national lenders and loan servicers.

29. Docx is a wholly owned subsidiary of LPS. Docx is the largest lien release and assignment processing firm in the U.S., with more than 100 employees. Docx software is used by banks to track U.S. residential mortgages from the time they are originated until either the debt is satisfied or the borrower defaults. When the borrower defaults and the bank decides to foreclose, LPS assists the bank is preparing the paperwork that is filed with the court.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

30. The Class Period begins on July 29, 2009. On that date, LPS issued a press release announcing its financial results for the second quarter of 2009. Among other things, the Company reported a 35.3% increase in consolidated revenues to $613.2 million and net earnings of $75.2 million or $0.78 per diluted share. Kennedy and Carbiener commented on the second quarter results, stating in pertinent part, as follows:

> *"LPS had a very strong second quarter despite a challenging macroeconomic environment. LPS, with its comprehensive end-to-end solutions for the mortgage and real estate industries, remains well positioned for an outstanding year in 2009 and to continue to grow profitably in 2010 and beyond,"* said Lee A. Kennedy, Chairman of LPS. "Second quarter earnings were very solid across all our businesses. *Our Default Services business continued to deliver strong results* while our Loan Facilitation Services benefitted from the improved origination environment. Also, our Mortgage Processing and other technology businesses had an excellent quarter," added Jeff Carbiener, President and CEO of LPS.

31. Carbiener further commented on the Company's 2009 and 2010 outlook, stating as follows:

> *"Second quarter and first half 2009 results were very solid* and while some of our markets and the broader economy in general pose challenges, *LPS with its*

> *market leading presence is well positioned for a strong second half in 2009 and to continue to grow revenue and earnings in 2010,"* said Jeff Carbiener. "Building on the strong first half of the year, we expect third quarter adjusted earnings to be in the range of $0.72-$0.78 per diluted share. For full year 2009, we now expect revenues to grow 20%-22% compared to 2008 and adjusted earnings to be in the $2.91-$3.01 per diluted share range."

32.     In response to the Company's positive financial statements and outlook, the price of LPS stock jumped 11.4%, or $3.47 per share, on July 30, 2009, to close at $33.81, on heavy trading volume.

33.     On August 14, 2009, LPS filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2009.  The Company's Form 10-Q was signed by Chan and reiterated the financial results contained in the Company's July 29, 2009 press release.

34.     On October 22, 2009, LPS issued a press release announcing its financial results for the third quarter of 2009.  Among other things, the Company reported a 32.7% increase in consolidated revenues to $619.4 million and net earnings of $80.2 million or $0.83 per diluted share. Kennedy and Carbiener commented on the third quarter results, stating in pertinent part, as follows:

> *"LPS delivered strong results in the third quarter despite an ongoing difficult business environment. LPS with its broad-based, technology-driven end-to-end solutions for the mortgage and real estate industries, remains well positioned for the fourth quarter and to continue to grow profitably in the years ahead,"* said Lee A. Kennedy, Executive Chairman of LPS. *"All our business segments continued to gain market share in the third quarter.* Our Mortgage Processing and other technology businesses posted solid earnings while *our Default Services business continued to deliver very strong results.* Also, our Loan Facilitation business benefitted from a stronger year-over-year origination market", added Jeff Carbiener, President and CEO of LPS.

35.     Carbiener further commented on the Company's 2009 and 2010 outlook, stating as follows:

> *"Third quarter and year-to-date 2009 results were very strong* and while the broader macro-economic environment and some of our markets continue to present challenges, *LPS with its solid market presence remains well positioned for a strong finish in 2009 and to continue to grow revenue and earnings in 2010,"* said Jeff Carbiener. "Building on the robust year-to-date results, we expect fourth quarter adjusted earnings to be in the range of 77-79 cents per diluted share. For full year 2009, we now expect revenues to grow 26%-28% compared to 2008 and adjusted earnings to be in the $3.07-$3.09 per diluted share range."

36.     Once again, in response to the Company's positive financial statements and outlook, shares of LPS rose 7.8%, or $3.18 per share, on October 23, 2009, to close at the Class Period high of $43.99.

37.     On November 16, 2009, LPS filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2009. The Company's Form 10-Q was signed by Chan and reiterated the financial results contained in the Company's October 22, 2009 press release.

38.     On February 8, 2010, LPS issued a press release announcing its financial results for the fourth quarter of 2009 and full-year 2009. Among other things, the Company reported a 28.3% increase in consolidated revenues to $608.1 million and net earnings of $74.9 million or $0.77 per diluted share. Kennedy and Carbiener commented on the fourth quarter and full-year results, stating in pertinent part, as follows:

> *"LPS had a strong fourth quarter despite challenging market conditions and a fragile macro-economic environment. LPS with its market-leading presence and its unique technology-driven solutions for the mortgage and real estate industries, remains well positioned to achieve its growth objectives in 2010 and beyond,"* said Lee A. Kennedy, Executive Chairman of LPS. "Our Loan Facilitation business posted record growth as it benefitted from a better year-over- year origination market while *our Default Services business continued to deliver very strong results.* Also, our Mortgage Processing and other technology businesses had another outstanding quarter. During 2009, we continued to strengthen our balance sheet and increase our financial flexibility by paying down $262 million in debt," added Jeff Carbiener, President and CEO of LPS.

39.     Carbiener further commented on the Company's 2009 and 2010 outlook, stating,

as follows:

> "*We had an exceptional year in 2009* and while the broader economy and the
> real estate market in particular remain challenging, *LPS has a strong presence in
> each of its businesses and is well positioned to grow revenue and earnings in
> 2010,"* said Jeff Carbiener. "Building on the strong 2009 results, we expect first
> quarter 2010 adjusted earnings to be in the range of 78-80 cents per diluted share.
> For full year 2010, we expect revenues to grow 8%-10% compared to 2009 and
> adjusted earnings to be in the $3.49-$3.56 per diluted share range."

40.     On February 23, 2010, LPS filed its annual report on Form 10-K with the SEC.

The Company's Form 10-K was signed by Carbiener and Chan and reiterated the Company's

financial results. In the 2009 annual report, the Company disclosed an investigation into the

Company's business practices, stating in pertinent part, as follows:

> *Recently, during an internal review of the business processes used by our
> document solutions subsidiary, we identified a business process that caused an
> error in the notarization of certain documents, some of which were used in
> foreclosure proceedings in various jurisdictions around the country.* The
> services performed by this subsidiary were offered to a limited number of
> customers, were unrelated to our core default management services and were
> immaterial to our financial results. We immediately corrected the business
> process and began to take remedial actions necessary to cure the defect in an
> effort to minimize the impact of the error. *We subsequently received an inquiry
> relating to this matter from the Clerk of Court of Fulton County, Georgia,
> which is the regulatory body responsible for licensing the notaries used by our
> document solutions subsidiary. In response, we met with the Clerk of Court,
> along with members of her staff, and reported on our identification of the error
> and the status of the corrective actions that were underway. We have since
> completed our remediation efforts with respect to the affected documents. Most
> recently, we have learned that the U.S. Attorney's office for the Middle District
> of Florida is reviewing the business processes of this subsidiary.* We have
> expressed our willingness to fully cooperate with the U.S. Attorney. We continue
> to believe that we have taken necessary remedial action with respect to this
> matter.

41.     Then, on Saturday April 3, 2010, *The Wall Street Journal* published an article

titled, "U.S. Probes Foreclosure-Data Provider." The article called into question LPS' subsidiary

Docx, and its preparation of documentation used by banks in the foreclosure process.  More specifically, the article described an investigation by the U.S. Attorney's Office for the Middle District of Florida.  The article stated, in pertinent part, as follows:

> The case follows on the dismissal of numerous foreclosure cases in which judges across the U.S. have found that the materials banks had submitted to support their claims were wrong. Faulty bank paperwork has been an issue in foreclosure proceedings since the housing crisis took hold a few years ago. It is often difficult to pin down who the real owner of a mortgage is, thanks to the complexity of the mortgage market.
>
> During the housing boom, mortgages were originated by lenders, quickly sold to Wall Street firms that bundled them into debt pools and then sold to investors as securities. The loans were supposed to change hands but the documents and contracts between borrowers and lenders often weren't altered to show changes in ownership, judges have ruled.
>
> That has made it hard for banks, which act on behalf of mortgage-securities investors in most foreclosure cases, to prove they own the loans in some instances.
>
> *LPS has said its software is used by banks to track the majority of U.S. residential mortgages from the time they are originated until the debt is satisfied or a borrower defaults. When a borrower defaults and a bank needs to foreclose, LPS helps process paperwork the bank uses in court.*
>
> \*   \*   \*
>
> *The wave of foreclosures and housing crisis appears to have helped LPS. According to the annual securities filing, foreclosure-related revenue was $1.1 billion last year compared with $473 million in 2007.*
>
> *LPS has acknowledged problems in its paperwork. In its annual securities filing, in which it disclosed the federal probe, the company said it had found "an error" in how Docx handled notarization of some documents. Docx also has processed documents used in courts that incorrectly claimed an entity called "Bogus Assignee" was the owner of the loan, according to documents reviewed by The Wall Street Journal.*
>
> Ms. Kersch said the "bogus" phrase was used as a placeholder. "Unfortunately, on a few occasions, the document was inadvertently recorded before the field was updated," she said.

42.   Following the publication of the *Wall Street Journal* article, shares of LPS stock dropped 4.12%, or $1.57 per share, on April 5, 2010, the next trading day, to close at $36.54, on heavy trading volume.

43.   On April 22, 2010, LPS issued a press release announcing its financial results for the first quarter of 2010.   Among other things, the Company reported an 11.8% increase in consolidated revenues to $592.4 million and net earnings of $72.5 million or $0.75 per diluted share.  Kennedy and Carbiener commented on the first quarter results, stating in pertinent part, as follows:

> "***LPS is off to a strong start in 2010*** despite difficult market conditions and a challenging broader macro-economic environment. ***LPS, with its strong market presence and its unique portfolio of services, remains well positioned to achieve its growth objectives in 2010 and beyond,***" said Lee A. Kennedy, Executive Chairman of LPS. "Our Loan Facilitation business posted record growth in a sluggish year-over-year origination market as we continued to gain market share. ***Our Default Services business grew year-over-year as well***, despite being impacted by broader industry slowdowns. Also, our Mortgage Processing and other Technology businesses delivered another strong quarter," added Jeff Carbiener, President and CEO of LPS.

44.   Carbiener further commented on the Company's 2009 and 2010 outlook, stating, as follows:

> "***We are off to a strong start in 2010*** and while the broader economy and some of our markets remain challenging, ***LPS has a market-leading presence in each of its businesses and remains in a good position to grow revenue and earnings in 2010***," said Jeff Carbiener. "Building on the first quarter results, we expect second quarter 2010 adjusted earnings to be in the range of 88-90 cents per diluted share. For full year 2010, we continue to expect revenues to grow 8%-10% compared to 2009, driven by the strong momentum in Loan Facilitation Services, key customer wins in our Desktop business, ***a solid run rate in March in Default Services combined with continued growth in foreclosure activity through the remainder of the year.*** Also, we continue to expect adjusted earnings to be in the $3.49-$3.56 per diluted share range."

45.     On May 7, 2010, LPS filed with the SEC its quarterly report on Form 10-Q for

the period ended March 31, 2010.  The Company's Form 10-Q was signed by Chan and

reiterated the Company's financial results contained in the April 22, 2010 press release.

46.     On July 22, 2010, LPS issued a press release announcing its financial results for

the second quarter of 2010.  Among other things, the Company reported a 2.3% decline in

consolidated revenues to $599.1 million and net earnings of $80.4 million or $0.85 per diluted

share. Kennedy and Carbiener commented on the second quarter results, stating in pertinent part,

as follows:

> "*LPS had a strong quarter* despite very difficult conditions in both the
> origination and default markets and a sustained challenging macro-economic
> environment. *LPS, with its comprehensive end-to-end solutions for the
> mortgage and real estate industries, remains well positioned for a solid 2010
> and to continue to grow profitably in 2011 and beyond,*" said Lee A. Kennedy,
> Executive Chairman of LPS. "Our Mortgage Processing business delivered
> another strong quarter and while *our Loan Facilitation and Default Services
> businesses were both impacted by sluggish industry trends, we continued to
> expand market share in both areas,*" added Jeff Carbiener, President and CEO
> of LPS.

47.     Carbiener further commented on the Company's 2009 and 2010 outlook, stating,

as follows:

> "*Second quarter and first half 2010 results were solid* given the challenges in
> our specific markets and the broader economic environment. *LPS with its
> market-leading presence remains well positioned to grow revenue and earnings
> in the second half of 2010 as well as in 2011,*" said Jeff Carbiener. "Based on
> trends in the first half of 2010 and the outlook for the remainder of the year for
> the origination and default markets, *we now expect full year 2010 revenues to
> grow 3%-6% compared to 2009*. Also, we continue to expect full year 2010
> adjusted earnings to be in the $3.49-$3.56 per diluted share range with third
> quarter adjusted earnings in the 88-90 cents per diluted share range."

48.     In response to the Company's negative financial news, shares of LPS dropped

6.71%, or $2.30 per share, on July 23, 2010, to close at $31.99, on heavy trading volume.

- 14 -

49.     On August 9, 2010, LPS filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2010.  The Company's Form 10-Q was signed by Chan and reiterated the Company's financial results contained in the Company's July 22, 2010 press release.

50.     On October 4, 2010, in response to continued media reports and government investigations calling into question the Company's default-related services that LPS provides to mortgage lenders and services, LPS issued a press release commenting on what it considered "mischaracterizations of its services."  The Company stated, as follows:

> LPS is issuing this statement in response to recent mischaracterizations in the media regarding the default-related services LPS provides to mortgage lenders/servicers. Specifically, recent concerns have focused on foreclosure issues related to the execution of affidavits containing substantive borrower information and the preparation of assignments of mortgage.

> LPS has not executed affidavits containing substantive borrower information on behalf of its lender/servicer clients since September 2008. When LPS performed this service, affidavits were prepared and provided by the lenders' or servicers' attorneys. These affidavits were then executed by LPS consistent with industry practice, under corporate resolution. LPS had processes in place to ensure the information in the affidavits was validated and that the affidavits were signed properly.

> In reference to assignments of mortgage, LPS has made previous statements regarding its document preparation subsidiary, Docx, LLC. This small subsidiary (less than one percent of LPS' revenue) prepared assignments of mortgage for two lenders/servicers between 2008 and 2009. Docx did not prepare or execute affidavits containing substantive borrower information and no longer provides document preparation services.

> During its operation, when lenders/servicers or their attorneys requested that Docx prepare an assignment of mortgage, the lenders/servicers or their attorneys provided the necessary borrower information, which was downloaded by Docx employees into a pre-approved document template. The document was then printed and either signed by the lender/servicer or Docx, pursuant to corporate resolution. Docx did not determine whether these documents were then used in a court proceeding - those decisions were made solely by the lenders/servicers or their attorneys.

There have also been reports in the media regarding varying signature styles on assignments of mortgage. The varying signature styles resulted from a decision made by the manager of Docx to allow an employee to sign an authorized employee's name with his or her express written consent. LPS was unaware of this practice. As previously reported, upon learning of it, LPS immediately took remedial actions to correct all assignments of mortgage signed in this manner and provided these corrected assignments of mortgage to the two lender/servicer clients or their attorneys. LPS continues to believe this will not have a material adverse impact on its business or results of operations.

51.     In response to the negative media news, ongoing investigation and the Company's statement, the market learned that LPS' business practices were potentially deceptive and fraudulent, causing the price of LPS stock to plummet an additional $2.72, or 8.6% per share, on October 4, 2010, to close at $28.76. The price of LPS stock fell another $1.45, or 5.04%, on October 5, 2010, to close at $27.31 per share, on unusually heavy trading volume.

52.     On October 8, 2010, the Company's robo-signing and troubling foreclosure tactics were summarized in an article by the *Daily Finance*, which stated, in pertinent part:

> *The mortgage foreclosure and robo-signing mess keeps getting messier. And the giant banks that have been caught up in the crisis have plenty of company, including Lender Processing Services and its subsidiary LPS, which plays a huge role in foreclosure process now in high gear across the U.S.* LPS describes itself as the nation's "number one provider of mortgage processing services, settlement services and default solutions," working with all the top-50 banks in the country.
>
> To provide its "default solutions," LPS maintains a nationwide network of attorneys who do enormous volumes of foreclosure work. The core of the service LPS provides is a software application that enables its attorneys to communicate with LPS and with LPS's financial institution clients. *Documents are uploaded, and sometimes created, in the system and then distributed for signing, often as it turns out, by robo-signers. LPS makes money from its default services work primarily via the various fees it charges attorneys it refers cases -- far more so than from the fees it charges its bank/mortgage servicer clients.*
>
> *Two class actions challenge LPS's get-paid-by-the-lawyers business model. That's made investors wary about LPS's stock, which took big tumbles on Oct. 4 and 5, and closed more than 5% lower on Oct. 8 at $26.39.*

- 16 -

**Illegal Fee-Sharing?**

First a look at the two major class actions, in Mississippi and Kentucky, that have been filed against LPS and local law firms LPS refers business to. While LPS had net income of $276 million in 2009, as the website Naked Capitalism discusses, the money at stake in the suits is enormous, potentially billions of dollars in attorney's fees. The Mississippi class action also targets a similar firm, Prommis Solutions, while the Kentucky class action focuses on LPS. The suits go to the heart of LPS's and Prommis's business models. In addition to the fee structure complaint, the respective suits charge LPS and Prommis with the unauthorized practice of law. And despite LPS's bold public statements that the suits pose little threat, an attorney who represented the plaintiff in a similar class action in 2008 strongly disagrees, disputing the way the company has characterized that prior suit.

At issue is the way money flows between the law firms and LPS/Prommis. Specifically, does the LPS/Prommis business model constitute illegal fee-sharing and/or kickbacks? Sharing legal fees with nonlawyers is illegal, and the neither LPS nor Prommis are law firms. If plaintiffs win either case, it's hard to see how the companies can continue in their present form.

53.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     the Company failed to disclose that it had engaged in improper and deceptive business practices;

(b)     the Company's subsidiary Docx had been falsifying documents through the use of robo signers;

(c)     the Company had engaged in improper fee sharing arrangements with foreclosure attorneys and/or law firms, including, but not limited to, undisclosed   contractual arrangements for impermissible legal fee splitting, which are camouflaged as various types of fees;

(d)     as a result of the Company's deceptive business practices, the Company reported misleading financial results; and

- 17 -

(e)      as a result of the foregoing, at all relevant times, the Company's financial outlook lacked a reasonable basis.

54.      As a result of defendants' false statements and omissions, LPS common stock traded at artificially inflated prices during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down approximately 37.9% from their Class Period high.

## ADDITIONAL SCIENTER ALLEGATIONS

55.      As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding LPS, their control over, and/or receipt and/or modification of LPS allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning LPS, participated in the fraudulent scheme alleged herein.

56.      During the Class Period, the artificially inflated price of LPS common stock directly benefited Kennedy, who sold 95,931 shares of common stock for $34.00 per share, and received insider trading proceeds of $3,261,654.

## LOSS CAUSATION/ECONOMIC LOSS

57.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of LPS common stock and operated as a fraud or deceit on Class Period purchasers of LPS common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market through partial disclosures, the price of LPS common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of LPS common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth about LPS was revealed through a series of partial disclosures that removed the artificial inflation from the price of LPS common stock.

58.     By failing to disclose to investors the adverse facts detailed herein, defendants presented a misleading picture of LPS' business and prospects.  Defendants' false and misleading statements had the intended effect and caused LPS common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $43.99 per share on October 23, 2009.

59.     As a direct result of the disclosures in the April 3, 2010 *Wall Street Journal* article, the July 22, 2010 financial results and the Company's October 4, 2010 statement regarding its business practices, LPS common stock fell precipitously.  These drops removed the artificial inflation from the price of LPS common stock, causing real economic loss to investors who had purchased LPS common stock at artificially inflated prices during the Class Period.

- 19 -

60.     The declines were a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price declines in LPS common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of LPS common stock and the subsequent significant declines in the value of LPS common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

61.     At all relevant times, the market for LPS common stock was an efficient market for the following reasons, among others:

(a)     LPS common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, LPS filed periodic public reports with the SEC and the NYSE;

(c)     LPS regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     LPS was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

62.     As a result of the foregoing, the market for LPS common stock promptly digested current information regarding LPS from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of LPS common stock during the Class Period suffered similar injury through their purchase of LPS common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

63.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of LPS who knew that those statements were false when made.

## COUNT I

### FOR VIOLATION OF §10(B) OF THE 1934 ACT AND RULE 10B-5
### AGAINST ALL DEFENDANTS

64.     Plaintiff incorporates ¶¶1-63 by reference.

65.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a)     employed devices, schemes and artifices to defraud;

    (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of LPS common stock during the Class Period.

67.     By virtue of the foregoing, LPS and the Individual Defendants have each violated §10b of the 1934 Act, and Rule 10b-5 promulgated thereunder.

68.     As a direct result and proximate result of defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of LPS stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for LPS common stock and experienced loses when the artificial inflation was released from LPS as a result of the partial revelations and stock price declines

detailed herein.  Plaintiff and the Class would not have purchased LPS common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### FOR VIOLATION OF §20(A) OF THE 1934 ACT
### AGAINST ALL DEFENDANTS

69.     Plaintiff incorporates ¶¶1-63 by reference.

70.     The Individual Defendants acted as controlling persons of LPS within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of LPS common stock, the Individual Defendants had the power and authority to cause LPS to engage in the wrongful conduct complained of herein.  LPS controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding plaintiff reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 22, 2010

ROBBINS GELLER RUDMAN
& DOWD LLP

ROBERT J. ROBBINS

ROBBINS GELLER RUDMAN
& DOWD LLP
PAUL J. GELLER
Florida Bar No. 984795
pgeller@rgrdlaw.com
DAVID J. GEORGE
Florida Bar No. 0898570
dgeorge@rgrdlaw.com
ROBERT J. ROBBINS
Florida Bar No. 0572233
rrobbins@rgrdlaw.com
BAILIE L. HEIKKINEN
Florida Bar No. 0055998
bheikkinen@rgrdlaw.com
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561/750-3000
561/750-3364 (fax)

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone: 313/578-1200
313/578-1201 (fax)

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF ST. CLAIR SHORES GENERAL EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery.

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _16_ day of _NOVEMBER_ 2010.

CITY OF ST. CLAIR SHORES GENERAL EMPLOYEES' RETIREMENT SYSTEM

By: _Robert H Huson_

Its: _Chairman_

SCHEDULE A

SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 11/30/2009 | 225 | $41.53 |
| 12/01/2009 | 540 | $41.98 |
| 12/02/2009 | 784 | $41.63 |
| 12/03/2009 | 120 | $41.20 |
| 07/02/2010 | 300 | $31.29 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 09/23/2010 | 367 | $32.04 |

*Opening position of 700 shares.